Good afternoon, our first case is number 22-1307, Quintez Talley v. Carey Moore, et al. Ms. Bailey? Good afternoon, Your Honors, and may it please the Court. Elizabeth Feeling, Court-Appointed Amicus Counsel, on behalf of Appellant Quintez Talley. I will address exhaustion. My co-counsel, Kameron King, will address the remaining issues in this appeal. And we would like to reserve three minutes for rebuttal.  Quintez Talley has attempted suicide using fire at least eight times while in Pennsylvania custody. Yet prison officials have disregarded his safety, including by placing him in cells that lack fire sprinklers. On July 2, 2019, Talley again attempted suicide by fire. And when prison officials failed to adequately respond to his grievance regarding that event, he filed this action in the District Court. But the District Court never evaluated Talley's claims on the merits, and rather disposed of them in two steps. First, it incorrectly deemed Talley a three-strikes litigant. All right, that issue's over. They've conceded that point. Yes, that's correct, Your Honor. The other error is that the District Court dismissed the only claims that it allowed Talley to file for failure to exhaust, relying on a rationale that Pennsylvania never raised below. That decision should be reversed. As this court has recognized in Shiflett v. Korsniak, inmates are excused from exhausting under the PLRA when administrative remedies are unavailable. And I'd like to highlight the three main ways prison officials' handling of Talley's grievance violated DOC rules, showing that administrative remedies were unavailable. First, prison officials rejected Talley's grievance for raising separate events, even though it complained of just one event, his July 2, 2019, suicide attempt. Second, they incorrectly instructed him to file his grievance using DC ADM 801, even though DC ADM 801's terms made clear it did not apply. And third, compounding these errors, when Talley brought up these issues in his grievance appeals, prison officials entirely failed to explain their decisions or respond to Talley's arguments. Why weren't these three claims that were made, why weren't they separate events? Your Honor, Talley's grievance only related to one event, his July 2, 2019, suicide attempt, and prison officials' conduct surrounding that event. But it seems to me, it seems to me, he complains about three different things. That they didn't properly respond to his concerns about suicide. That was one of them. He was complaining about the fact that there were no sprinkler systems in the RHU. That was the second. And the third was that over a period of time, the prison officials have been filing misconducts against people like Talley who attempted to take their own life. So it seems to me that there are three separate categories, events. Why wasn't, why weren't they correct in saying that? Your Honor, DC 80M 804 never defines the word event, but it uses the word event rather than problem. And I think the three different categories that you've identified are better considered as problems flowing from the same event rather than distinct events. But even if this court disagrees with Talley's conception of the separate events rule, he also invoked the exception to that rule, which would allow him to raise separate events when necessary to support his claim. And Talley clearly thought that was the case because these three problems were interrelated and grieving any one of them separately would have missed the significance of Talley's claims overall. But prison officials never actually defined what the separate events were. But didn't they give him, didn't they remind him he could have filed an amended grievance? And he had seven days to file an amended grievance and he chose not to. That's correct. Talley had seven days to file an amended grievance, but that was from the initial rejection by the facility grievance coordinator. So when Talley's initial grievance was rejected by the facility grievance coordinator, the facility grievance coordinator never told him what the separate events he was grieving were. And they also incorrectly instructed him to file through a separate channel. Talley interpreted that to mean that they had not considered whether the necessary exception applied and he chose to invoke that on appeal, hoping to show his compliance with the grievance process. But prison officials, when he raised that issue on appeal, never responded to either his invocation of the necessary exception or chose to explain in further detail what the separate events actually were. And I think that gets to the third issue with prison officials handling of Talley's grievance. DC 80M 804 expressly requires the facility manager to respond to all appeal points raised by an inmate. And the facility manager never responded to the appeal points that Talley raised. Instead, he issued the same kind of conclusory rejection that Talley had received by the facility grievance coordinator. And this all, I think, ultimately gets to the purpose of the PLRA's exhaustion requirement, which is to give prison officials a chance to respond to an inmate's grievance before litigation. And Talley clearly put prison officials on notice about his complaints because he told them about his injuries stemming from their failure to equip his cell with a fire sprinkler. Accordingly, the purposes of the PLRA's exhaustion rule were thus fully served and Talley's claim should proceed and be decided on their merits. How does he keep getting the ability to ignite things in the prison? Your Honor, is it the same modus operandi all the time or is it different? What did he do this time? Your Honor, I don't believe the particular mechanism that he used is in the record. My understanding is that RGU cells have very limited materials that are flammable. So presumably he was using his clothing or bedding to start a fire. But prison officials were on notice that Talley was able to start fires in his cell, even though the exact mechanism isn't clear here. Can you talk a little bit about how the fire sprinkler claim was defined in the district court and how we should think about that relative to the exhaustion issue? Yes, Your Honor. The district court considered Talley's fire sprinkler claim to be what he grieved regarding prison officials' failure to equip his cell at Cy Fiat's RGU with fire sprinklers. So I think it should be defined as his placement in a cell in this institution without a fire sprinkler. I think you mentioned three points when you first set up. So we talked about the one event rule. Do you want to speak a little bit to Rule 801? Yes, absolutely. So DC ADM 801 is a separate channel that DOC has for inmates to grieve a limited subset of issues. And among those issues is specific inmate misconduct charges. Prison officials incorrectly instructed Talley that he had to file his grievance using that channel, even though it wasn't applicable because Talley never challenged the specific inmate misconduct charge. And even if he had sought to challenge the misconduct he was given for his July 2, 2019 suicide attempt, that channel also expressly forbids inmates from bringing a challenge to a misconduct for which they were found not guilty, which Talley was here. Had he been adjudicated not guilty at the time he filed the complaint form that's in the record here? He had not been found not guilty when he filed his initial grievance, but by the time he appealed to the facility manager, he was found not guilty. And he mentioned that he couldn't challenge his misconduct through that channel. But regardless, he maintained that it would have been inappropriate because he wasn't challenging a specific misconduct charge, but rather DOC's pattern and practice of issuing misconducts for suicide attempts more generally. You got 15 seconds for a .3 over rebuttal. Oh, absolutely. You can save it. Third, in compounding these problems, when Talley pointed out these issues on appeals, prison officials violated their rule, requiring them to explain all appeal points by an inmate. And I see that my time has lapsed. So if your honors have no further questions, Mr. King will address the remaining issues. Thank you, Ms. Bailey. Mr. King.  Good afternoon, your honors. As your honors indicated, Talley was erroneously denied IFP status to file most of his claims in the district court. The question, then, is what should happen to the group of claims that he was never even permitted to file below? Defendants ask you to reach out and treat their appellate briefing like a motion to dismiss and dispose of those claims on the merits. But you should decline that invitation for three reasons. First, defendants identify no cases in which you have done so. In prior cases where plaintiffs were denied IFP status by the district court and this circuit reversed, its consistent practice has been to remand and allow the district court to address the complaint first. Second, setting aside the IFP context, where this court has never done what defendants ask, in general, this court only reaches issues the district court did not in exceptional circumstances. But this is a routine suit presenting mixed questions that the district court ought to address first. And third, more than unnecessary, reaching the merits would be inefficient because some of Talley's claims will be remanded in any case. All right. I agree with your first two points, but I'm not sure I agree with your second, your third point. Your first two points are true in the vast majority of cases we handle. We are not a court of first view. We're a court of review. We like to have a full record. As you know, we have a robust forfeiture jurisprudence. But the PLRA, and the PLRA has the word appeal in it, does a lot of work, doesn't it? Doesn't the PLRA instruct us that when we see a claim that is a nonstarter, regardless of what the district court did or didn't do with it, that we should address it and kick it if we can see that it's a nonstarter? Under 28 U.S.C. 1915e2, which permits or instructs this court to dismiss any claim that it finds lacks merit, the standard is not that it must go inspect every single claim. It's rather that if this court determines that a claim has been filed that fails to state a claim, it shall dismiss it. So although it's true that if it were to reach that conclusion, it should dismiss it, we argue this court should not reach out and touch the merits in this case. So that violates your third principle, efficiency. It's hyper inefficient to send back to the district court a panoply of claims that have no legitimate chance of success. Efficiency, combined with the PLA's dictate that you just adverted to, would seem to strongly indicate that we should separate the wheat from the chaff, shall we say. Obviously, this case is going to continue. Mr. Talley is going to be back in the district court. But why shouldn't we separate the wheat from the chaff? A few reasons, your honor. First, the facts of these claims are deeply interrelated. The adequacy of the response of prison officials is tied to what they did or didn't say to Dr. Saavedra, against whom Talley's medical malpractice claims are brought. And those are claims on which defendants take note. Those might be the ones that survive. Yes. Maybe not Eighth Amendment, maybe not Fourteenth Amendment. You've got a lot of issues with sovereign immunity. You've got some problems with qualified immunity. Moreover, can you help us with some of those? Because some of those claims appear, at first blush anyway, to be non-starters for the reasons I just mentioned. Many of those claims are of the sort that this court has recognized it should not address without a more developed record. Looking to the Fourteenth Amendment, the atypical and significant hardship inquiry, this court has recognized is intensely fact specific and therefore generally not appropriately resolved on a motion to dismiss. And once this court is sending back parts of these fact sets to the district court, I think that the efficiency gains from knocking out one claim out of three are greatly reduced. I see that my time is expiring. If there are no further questions, I'd like to reserve my remaining three minutes for rebuttal. Thank you very much, Mr. King, Ms. Kelso. Good afternoon, Your Honor. May it please the court. My name is Chelsea Kelso. I'm with the Pennsylvania Office of Attorney General and I represent the appellees, the Department of General Services, the Department of Corrections and its officials. This court should affirm summary judgment in the appellee's favor because Mr. Talley failed to properly exhaust his administrative remedies and nothing in the prison administrator's response to his grievance rendered that process unavailable to him. Before filing suit, Mr. Talley filed a single grievance with the Department of Corrections where he sought to bring three different complaints to the prison's attention. First, he described at length how he believes certain officials inadequately responded to his suicidal ideation and attempt on July 2nd, 2019. After he went through that at quite length, he added two additional... We understand what the facts are, but why address Judge Fischer's question that he asked your friend on the other side? You don't use the word event. Your briefing uses the word problem. That's not the key word. Isn't it three problems arising from one event? Isn't Talley correct about that? I don't think he is correct about that, Your Honor. I'll answer the question first. I think they are separate events. The lack of a fire sprinkler from his individual cell is an ongoing event, so it's awkward to describe it as a concrete time-bound event. In the same way, his suicide attempt and the response there, too, as Amicus describes it, is more time-bound and is easier to describe in that way. It's less awkward to describe in that way. I do want to take a step back. We articulated in our brief how when the Department of Corrections arrives at a procedural default decision, we don't think this court has necessarily said that the federal courts undertake a de novo review of the prison itself's procedural default decision. What the federal courts do is they look at whether anything the prison administrators did in that instance rendered the grievance process unavailable to that prisoner. I think the proper context for considering what the Department of Corrections did in this instance is asking whether their response or any way in which they responded or processed Mr. Talley's grievance rendered that process unavailable to him. I think the argument... What's our review on that? What's our standard review on unavailability? It's a question of law, Your Honor. De novo, it's a question of law. Availability is a question of law. The upshot of it being an unavailability analysis as opposed to a failure to exhaust analysis is that flips the burden to Mr. Talley because the Department of Corrections has proffered that there was a failure to exhaust a procedural default in this instance. And so it becomes incumbent upon Mr. Talley to demonstrate that something in that process rendered the grievance process unavailable to Mr. Talley. And I think the best way to conceive of Amicus' arguments on the other side is that something within the processing of this particular grievance that included the fire sprinkler claims and the misconduct claims and the deliberate indifference claims was that it was rendered opaque by the processing that was provided by the Department of Corrections. And plainly, I think that's incorrect. Perhaps Mr. Talley himself was confused by the response that he received from Department of Corrections rejecting his grievance because of the separate events requirement and because of the 801-804 distinction. But that harkens back to the specific plain error or mistake that standard that was rejected in Ross v. Blake. In that case, a prisoner explained that the Maryland Department of Corrections' two-track system was too confusing and he had made a reasonable mistake. And the Supreme Court said a reasonable mistake is not sufficient. If there's going to be an exception applied for opaqueness making the grievance process unavailable, it has to be so difficult that basically a reasonable prisoner can't make their way through the grievance process. But you're presuming Talley made the mistake. And part of your argument, as I recall, is that he can't use 801 to challenge a misconduct. Is that right? There is a distinction. You cannot use an 804 grievance to challenge a misconduct for which you have adjudicated not guilty. Hasn't Talley, in the process, dropped that claim? The 801 argument really is to the side. When he responded to the exhaustion question below, I believe his declaration appears in the record at JA-159. He focused exclusively on whether or not on the separate event requirement. So when he was trying to make the case that the grievance process was unavailable to him, he focused on the separate event requirement, which we think is correct because under Shifflett v. Korsniak, in other cases, Jones v. Bachmann, the Supreme Court as well, you look at exhaustion claim by claim. And when we think about his fire sprinkler claim in particular, the reason that that claim was rejected was not an 801-804 issue that kind of underscores the separate events that were part of his grievance. But it was because of the combination of separate events issue. Do the prison's regulations speak to a situation where there's multiple defects in a grievance? And so in this case, arguably an 801 defect and then a separate events defect. What happens next? There is nothing specifically in the DCADM-804 that address what to do when there are two sort of equal bases for rejection of a grievance. I suppose the prison administrators, the facility grievance coordinator, could have rejected that grievance initially for just one reason, but chose to do two because two applied. And just briefly, I would like to explain, you know, that separate events requirement is not for naught. The reason that there's a separate events requirement is pursuant to the DCADM-804. When a facility grievance coordinator receives that initial grievance, if it is compliant with that policy, the FGC then sends that grievance to an appropriate grievance officer who has the authority and the knowledge to process that grievance. And that furthers one of the primary purposes of the PLRA, which is to facilitate record development and settlement. So essentially getting these grievances in front of the appropriate persons at the prison itself so that if there is a possibility to arrive at a resolution of the grievance that's satisfactory to everyone, there is that chance without it being a federal case. Is there anything in the record about how a grievance that's focused on concerns about medical adequacy and medical treatment will be routed versus a grievance about sprinklers, basically the conditions within the facility? I don't think there's anything in the record to that effect, Your Honor. But I think, you know, it's somewhat evident from the grievance itself and from the complaint that the individual who would have the authority and knowledge to handle basically a building's code type of issue, which is the fire sprinkler claim that involves like the Department of General Services, is going to be a different person than, say, you know, if an individual corrections officer violates some or to use excessive force or something like that. That would go to their unit manager. Yeah, I agree with you that that would be the ideal process. I'm just wondering if there's anything that we could rely on to say that that is the process here. I think the only thing that you could rely on is in the glossary of terms for the DC ADM 804. It explains how the facility grievance coordinator sifts the grievances that comes in and assigns them to grievance officers who have appropriate authority and knowledge. Can you help us with the remand here? What do you concede is live on remand? I believe the only thing that ought to be live on remand is medical negligence claims against persons who would not fall. And MHM potentially. I don't want to speak to, you know. And they weren't even served yet. No, that's correct, Your Honor. And it might be the case that we have no ground under the PLRA to throw those med mal claims out. What about the RA? I think you have a good argument, perhaps under the ADA, right, that you've got immunity. But I don't see that immunity doesn't obtain with the RA, I don't think. Well, I think so. I think that ADA and the RA claims would lie potentially against the institutional defendants under Montana's versus Price. However, I think just in terms of the elements of an ADA RA claim in a prison setting, I think what we're looking for here is any allegation of an open and obvious need. And the only thing that Mr. Talley states in his complaint would support the existence of an open obvious need is prior cases in which he sued Secretary Wetzel or Robert McSurdy because he attempted to harm himself in this way. However, we, there are. We're on notice this is an ongoing problem for sure. They were, I would say. I mean, I don't even understand how this happens. How can someone get access to lighters, matches? How does this happen? That's a great question, Your Honor. I asked my client about that and I didn't receive an answer. And I scoured some of the logs from around that time. And it also was unclear to me how he got his hands on materials to be able to start a fire on that day. I would just say to the extent that prior suits would be what put DOC officials on notice of a propensity to self-harm by lighting fires. There are also cases where Secretary Wetzel has been sued, like this court's decision in Talley versus Grisomer, I believe it is, where he had self-harmed in other ways by cutting. So I don't think there's an adequate allegation of an open and obvious need of this specific reason. Well, but isn't it, isn't the connection with the RHU? I mean, nobody wants to be in the RHU. But he seems to want to be in the RHU a lot less than other people, right? There's a consistent pattern here of him taking extreme action while he's in the RHU. Is there not? Well, in this instance, it didn't really have anything to do with his presence in the RHU. I thought he said he couldn't take it anymore in the RHU and he had to kill himself. Wasn't that the record? I think with the record, the record is more focused upon his being denied an opportunity to meet with his psychiatric review team on the day in question. I think he alleged that he was taking longer than corrections officers, who are not named defendants in this action, would have liked for him to be able to meet with his review team on that day. And critically, in terms of the deprivation that he premises some of these claims upon with regard to his misconduct claims, it would be that he was, not that he, not something about being, you know, held in the RHU longer than he ought to have been. It was about privileges that he believes he was entitled to based on where he was in the special management program. And I think the deprivation of privileges certainly wouldn't support like a disability discrimination claim or a 1983. All right, but other things, Mike, give us the low-hanging fruit. What are the claims that were not passed upon by the district court that under the PLRA's gatekeeping function, we should be writing an opinion dismissing? Start with the, from the easiest to the hardest. Sure. You didn't admit that a lot is left on remand. I was hoping you might admit a few more things are left on remand, but that's okay. So start with the easiest ones for us to get rid of. Sure. I think I would start maybe in, if I'm recalling correctly, reverse order from what we explained in our brief. I think I would start with the deliberate indifference claims against the two corrections officers who are alleged to have not responded appropriately to Mr. Talley's vulnerability to suicide on July 2nd, 2019. According to the plain allegations in the complaint, they told appropriate medical personnel, and I don't think that that can support recklessness or indifference or recklessness or deliberate indifference on their part.  What are their names? Dobish and Higginbotham. Okay. All right. So no deliberate indifference for Dobish and Higginbotham. What's next? Correct, Your Honor. From there, I would say that the misconducts, any, either of the claims really, the ADA, RA, or the 1983 claims that are premised upon being issued misconducts have serious, well, for 1983 have serious personal involvement problems because in the record, the misconduct is in the record and the officer who's indicated as having charged Mr. Talley is not among the defendants. So there's a serious personal involvement problem for purposes of a 1983 action. For which defendants? That would be, that would be as to all defendants because it's a personal involvement problem, Your Honor. So I don't think any of the defendants in this action are, are identified as having been related to having issued that misconduct. He, Mr. Talley. So everything related to the misconduct is, fails for want of personal involvement? For the 1983, yes, Your Honor. And then for the ADA, RA claims, that would be against the entities, the entity defendants. I think we, we cite, I believe at page 52 of our brief, a number of cases that indicate that a temporary deprivation, even when it is related to mental health, is not actionable as an ADA, RA claim. And that's where we get into, you know, the denial of privileges. Sounds fact bound. Isn't the district court going to have to figure out whether it was temporary or not? According to Mr. Talley's allegations, it was temporary. I think it's a little confusing how he describes the number of days. I think he refers to a seven-day. Yeah, that sounds like a, okay, amend the complaint. I mean, that's, that doesn't sound like the type of thing that's clear enough for an appellate court to kick out. I'm surprised you picked the RA and the ADA instead of the Eighth Amendment. I think, well, yeah. I mean, the Eighth Amendment claim is what? That it's cruel and unusual punishment to have a cell with no sprinkler system in it? That would be the claim, I believe, Your Honor. So yes, I do think that is also an easy one to take. Okay, where's the, where's the, where's the law that says that? I think, you know, there are not many cases. I'll ask Mr. King that. I'm giving him a heads up. Okay. I do see that I am almost out of time, Your Honor. Keep going. No, we've got, we've got a lot to unpack here. Okay, sounds good. So I think that that would, in terms of the, I believe we left off at the ADA RAA claims for the misconducts. And we cited a number of cases that a temporary deprivation is, and I know you had the question about whether or not temporary is a fact-bound issue. I would say, you know, and I don't want to get too much into this. I recognize and respect that our motion to dismiss for Talley's lack of involvement was denied. However, I think when we think about whether or not Mr. Talley is entitled to an opportunity amend, it does loom large that he is not present in this action, even though he was appointed amicus counsel and not a direct representative in this court. And even after having been served with the motion to dismiss, did not respond. So I do think a failure to prosecute, even though I respect the court's decision not to dismiss on the appeal on that basis, is a reason to not send this back to amend, even if there are sort of conceivable amendments that could be had. And I believe, Your Honor. What about 14th Amendment? I, yeah, I think the, in terms of the deprivation of a fire sprinkler, I don't think that's a typical hardship incident to prison life. So that one would fall away as well. I, from memory, I think might have gone through them. But unless the court has any other questions, I just ask the court to affirm and dispense with Mr. Talley's other claims. All right. Thank you, Ms. Kelso. We'll hear a rebuttal from Mr. King. Could I ask you to start with why you disagree with what your friend said about the ADA and the RA claims? So on the ADA and the RA claims. So there are several ADA and RA claims, and we think that all of them are viable. We'll first start, perhaps, with the misconduct portion of the ADA and RA claims. And we note that it doesn't sound as though defendants dispute that such a practice of violating their own written policy about not issuing misconducts for suicidal behavior could state such a claim. It sounds as though it's a factual dispute about whether Talley has sufficiently alleged that from the briefs. But he specifically notes that a practice has been allowed to develop under the auspices of Secretary Wetzel of issuing such misconducts. And we think that that suffices to state that claim. And similarly, under the lack of a fire sprinkler. While it's true that some cases have suggested that the lack of a fire sprinkler or a particular fire safety mechanism is in general not going to be sufficient to state a claim. Those are those claims. Those cases did not involve cases such as this one where there's a particular reason that that lack renders the fire safety mechanism. And what is that reason? Here it's Talley's mental health disability, which renders him very likely to attempt suicide by fire, as evidenced by his multiple suicide attempts using fire in the past. But wasn't this a policy adopted by the department a year before this particular suicide attempt? It's true that the lack of a fire sprinkler was not a recently adopted policy. But Talley was continued to be housed in a cell that made him increasingly vulnerable to the effects of his mental health disability. Doesn't all that, when you start unpacking it, hurt your argument on the fact that these were not separate events? And that was my original question to your co-counsel, was it seemed to me that these were three separate issues that Mr. Talley has with the Department of Corrections. One of which had to deal with his suicide on January the 19th. But the other two were longstanding. It's certainly true that Talley raised separate problems, but we think that he still raised one event. Because it's difficult to understand the import of the lack of response of the COs without looking to the fact that he's currently being housed in a cell that lacks adequate fire sprinklers. And he's alleged that he's going to attempt to set himself on fire. So we think that those are still bound in the same event, even though they spin off different problems. And that, we think, gets to the point that the rule prevents grieving separate events. And it seemed like what Ms. Kelso said was that, look, you know, the reason why DOC wants to have these issues stated separately is that they can be cabined into different holes. And they can be sent to different people within the institution. And in fact, the question about the sprinkler system would probably have to be sent all the way up to Mr. Wetzel, who is the secretary of the Department of Corrections. So, I mean, why isn't there a response that, look, the way Talley did this, he did not exhaust properly his administrative remedies? And Talley is someone who's knowledgeable about all of the administrative remedies, including the procedural remedies that get into this court. I mean, this is no first-time filer. I think I'll take those in reverse order, if I may, Your Honor. First, it's true— The easy one. You want the easy one first, right? It's always a good idea. It's true that Talley has filed grievances before and filed lawsuits before. But there's no evidence that those have been about this specific procedural mechanism, the separate events rule, or the overlap between 801 and 804. So it's not clear that he has any special knowledge about how to navigate these confusing procedures. Turning to the ease for the prison, I'll note that the prison is free to offer a more narrowly tailored definition of event, should they want to. It's just that they haven't done so here, and the plain reading of event should encompass Talley's suicide attempt. So you're saying ADM 804 is too complex and it should be simplified for people in positions like Talley? We think that the way that the separate events rule is written and applied right now may be too complex and has rendered Talley— Does that make it unavailable? So we think that if Talley is correct about this being one event, then you don't need to reach unavailability. But if the events rule is narrower in a way that's unexpected to prisoners, then we would argue that that renders this unavailable because it's too confusing to navigate. And if you're correct that it's unavailable, then that means that he exhausted his requirements under the exhaustion standard? Not quite, Your Honor. I think that would mean that he was excused from having to exhaust. But our argument that he actually exhausted turns on him being— You're saying that it is actually step two? Yes. Okay. Can you tell us why the Commonwealth defendants are not entitled to sovereign immunity for any constitutional claim against them in their official capacities? So we—this court has recognized in cases like Stringer v. County of Bucks that that's an intensely fact-specific inquiry. And it's also on the defendant to show that they meet that burden. Here, Talley's filed a pro se complaint, and he had no duty to plead around qualified immunity. All right. Give us some facts. Give us some facts that he could have pleaded if he were represented ably by you all. And so we think that more detail about perhaps how long it would have taken these—the correctional officers to respond, because it's slightly unclear in his complaint, could have gone to that—could have given sufficient detail to provide a showing of qualified immunity. I point in connection to this to Talley v. Griessmer, where this court held—Talley stated an Eighth Amendment vulnerability to suicide claim by saying he was left alone for an hour with— Was that an official capacity claim or individual capacity claim? In Talley v. Griessmer, I believe that it was an individual capacity Eighth Amendment— That's why I asked you about official. Yeah. I think official—you're in trouble on official, and I haven't heard a reason why they're not entitled to sovereign immunity on official capacity claims. That doesn't address individual capacity. So I think that the best reason to say that this court should not reach that issue quite yet is that Talley hasn't even been given leave to—he hasn't filed many of these claims. He's not been allowed to amend as of right these claims yet. So there's a lot that we do not know about what Mr. Talley would say were he given the opportunity to say it. If this court has no further questions, I see that my time has elapsed, and I would ask it to reverse and remand. Thank you. Thank you very much, Mr. King. Thank you, Ms. Behling. Thank you, Mr. Roth, supervising attorney. We appreciate the clinic undertaking this representation pro bono. Thank you very much, Ms. Kelso. The court will take the matter under advisement.